Jones, Chief Judge,
delivered the opinion of the court:
This suit involves a construction contract. The plaintiff claims that it was required to do extra work because of un *672 foreseen conditions in the form of hard rock shale which was outside the scope of the contract.
On Thursday, September 20, 1951, a division of the Department of the Army issued an invitation to bid for the construction of garages, the paving of a parking area, and the excavation of trenches and the erection of a wire fence at the National Guard Motor Vehicle Storage Building in Garrett County, Maryland. Because of emergency need, the invitation required the bids to be submitted by 2 p.m. on Wednesday, September 26, 1951.
The invitation required the successful bidder to furnish all plant, labor, materials and equipment, and to perform all work for the project in accordance with the specifications and drawings.
Within the limited time provided the plaintiff’s representative examined the drawings and specifications and the invitation to bid, visited the site, which was more than 100 miles from its principal office in Baltimore, and submitted a bid. It was awarded the contract to construct the project for the lump sum price of $52,204.
There were several additional contracts let to other contractors for construction at the same site. These included a motor vehicle storage building, the construction of a road, and a boilerhouse addition to the motor vehicle storage building.
The entire area was to be fenced by the plaintiff in addition to the construction of garages and the parking area. None of the construction involved in the other contracts required as deep excavation as that required of plaintiff. Plaintiff was to build four garages in addition to a parking lot. It was required to do excavating both for the parking lot and the footings or trenches of a total length of between 500 and 600 feet. Near the bottom of the trenches the plaintiff encountered hard rock shale which it asserts was unforeseen and which was not contemplated by either party to the contract and was not covered by the terms of the contract.
A pertinent provision of the specifications on the subject of excavation is found in subparagraph 3-1 (b), which is as follows:
*673 (b) Type of material to be excavated in all cases such as can be moved by normal job labor and equipment, power shovels, without resorting to blasting.
The single issue in this case is whether the material in the lower part of these excavations could be moved by normal job labor and equipment without resort to blasting. The findings set out in detail the nature of the work and the conditions upon which plaintiff’s claim is based.
We have found that normal job labor and shovels and the usual normal equipment were not sufficient to remove this hard rock shale without blasting. The plaintiff was not permitted to blast. The plaintiff found that while the bulldozer and the backhoe were sufficient to remove the upper part of the material, neither of them was sufficient to remove the consolidated and hard rock which was found as the excavation ran deeper. At that point the rock could not be removed by pick and shovel or by powered machines such as shovel or backhoe. The backhoe operates something like a power shovel. It has a bucket attached to the boom and operates in reverse so that the bucket moves toward the equipment instead of away from it, as does the power shovel. The plaintiff found that by the use of the power shovel and the backhoe in the hard rock not only would the machinery be injured but the ground so torn up as to interfere with the proper walling and foundations.
The plaintiff found that the rock structure could only be removed by using pneumatic equipment which consisted of a compressor and a breaker, or by blasting. It was forbidden to use blasting because of the injury that might be caused to the foundations of buildings and other structures. The pneumatic method proved effective but the excess cost of this method amounted to about $20 per cubic yard of materials removed.
A designated representative of the contracting officer examined the site before the full depth of the excavation had been finished. He determined at that time that the excavation was within the terms of the contract and could be removed by normal methods, labor and equipment. However, he later examined the conditions in the parking area and found that hard rock was encountered and recommended *674 the plaintiff be paid $20 per cubic yard for the excess cost of the excavation in the parking area. Apparently, he did not again examine the other portion of the excavation, although it developed that practically the same hard rock condition developed in the deep part of that excavation as had been disclosed in the parking area.
Plaintiff was issued a change order for the excavation in the parking area and was paid therefor. However, it was refused payment for the 229.94 cubic yards of the material which plaintiff excavated from the garage footings, the garage floor area, the utility trench, and the gatepost holes, as set forth in finding 13, and set forth in detail in the latter part of finding 15. The excess cost of this material at $20 per cubic yard totals the sum of $4,598.80.
The defendant contends that the decision of the Armed Services Board of Contract Appeals, which was adverse to the plaintiff to the effect that no changed condition was encountered, was a factual issue and is supported by substantial evidence. The defendant also contends that plaintiff failed to give timely written notice of the changed condition.
We have set out in finding 17 in full detail the reason why both of these defenses must be rejected. There is no evidence of any kind that the hard material in the footings and the trenches could have been removed by a power shovel. There was testimony that it could have been removed by a backhoe. However, this evidence is conflicting and taken as a whole is neither persuasive nor substantial. The overwhelming weight of the credible evidence is that a backhoe could not have been used effectively and efficiently to remove the material which was too hard to be thus removed. It is also very clear that in all probability such effort would have materially damaged the expensive equipment that would have been involved. In addition, the testimony indicates that if the backhoe could have been used it would have left voids beyond the neat lines of the sides or bottom of the footing. This would have required the contractor to fill such voids with concrete at its own expense. The testimony shows that this is not a practical or efficient contract procedure and could not have been within the contemplation of the parties.
*675 As to the question of written notice, the contracting officer or his designated representative was thoroughly familiar with the written requests of the plaintiff for payment of the excess cost occasioned by the removal of the hard rock conditions that were encountered. They discussed these nlftims from time to time and when the final adverse decision was made the plaintiff appealed that decision. It had filed a written notice originally and we do not construe that it must file an additional claim for excess cost every time a new rock was discovered. A part of the board’s finding is in the nature of a conclusion of law.
The facts and the evidence when taken as a whole in the light of the conditions that developed are so overwhelming as to preclude any other reasonable conclusion than that unforeseen conditions developed which made it impossible to remove the hard material thus encountered by normal job labor and equipment and pick shovels. The plaintiff is entitled to recover the sum of $4,598.80.
It is so ordered.
Littleton, Judge (Bet.)/ Laramore, Judge; Madden, Judge; and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul It. Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized under the laws of the State of Maryland, with its office in Baltimore, Maryland.
2. On Thursday, September 20, 1951, an invitation for bids was issued by the State of Maryland Office of the United States Property & Disbursing Officer, National Guard Bureau, Department of the Army, for the construction of garages, the paving of a parking area, and the erection of a wire fence at the National Guard Motor Vehicle Storage Building, located at Oakland, Garrett County, Maryland. The invitation required the bids to be submitted by 2 p.m., Wednesday, September 26, 1951.
The invitation required the furnishing of all plant, labor, materials and equipment, and the performing of all work *676 for tbe project, in strict performance with the specifications and drawings. It also provided:
5. Bidders should carefully examine the drawings and specifications, visit the site of the work, and fully inform themselves as to all conditions, and matters which can in any way affect the work or the cost thereof. Should a bidder find discrepancies in, or omissions from, the drawings, specifications or other documents, or should he be in doubt as to their meaning, he should at once notify the contracting officer and obtain clarification prior to submitting any bid.
3. Plaintiff decided to submit a bid and in the interval of time between the receipt by it of the invitation and the time for the submission of its bid, a representative of the plaintiff inspected the site of the work, which was approximately 175 miles from its office in Baltimore. Plaintiff also familiarized itself with the specifications and drawings, computed the quantities of work and materials involved, obtained materials prices and various subcontractors’ quotations, and investigated the local labor situation.
4. Plaintiff prepared and duly filed a bid, which was accepted, and on September 27, 1951, it entered into a contract with defendant, acting by a contracting officer of the Department of the Army, to construct the project for the lump sum price of $52,204, in strict accordance with the specifications and drawings, which were made a part of the contract.
5. (a) The contract provided in part as follows:
❖ * * * *
A Ohanged Conditions. — Should the contractor, encounter or the Government discover, during the progress of the work subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications, the contracting officer shall be notified promptly in writing of such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall be modified to provide for any increase or decrease of cost and/or difference in time re- *677 suiting from such conditions. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
*****
6. Disputes. — Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the contractor. Within 30 days from the date of receipt of such copy, the contractor may appeal by mailing or otherwise furnishing to the contracting officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive; provided that, if no such appeal is taken, the decision of the contracting officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the contractor shall proceed diligently with the performance of the contract and in accordance with the contracting officer’s decision.
❖ tf* ❖ * *
27. Definitions. — As used throughout this contract, the following terms shall have the meaning set forth below: *****
(b) The term “contracting officer” means the person executing this contract on behalf of the Government and any other officer or civilian employee who is properly designated contracting officer; and the term includes, except as otherwise provided in this contract, the authorized representative of a contracting officer acting within the limits of his authority.
*****
(b) The specifications provided in part 'as follows:
*****
SECTION m
EXCAVATION AND GRADING
3-1 EXCAVATION:
(a) Do all excavation as shown on plans or as required by the complete “work”. Care must be taken not to excavate below proper level for placement of any footings. No backfilling under footings will be permitted. The *678 bottoms of all trenches to receive footings must be level regardless of character of excavated material. When excavation is carried below proper levels, additional concrete must be added to the bottom of the footing to bring the top of the footings as shown to the proper level as shown on drawings. Top soil shall be carefully removed and stacked and shall be spread at completion of project at points indicated.
(b) Type of material to be excavated in all cases such as can be moved by normal job labor and equipment, power shovels, without resorting to blasting.
*****
SECTION XV
CONSTRUCTION METHODS
15-1 EXCAVATION:
The Contractor shall accept the premises as he finds them and shall excavate and prepare the area as necessary for the execution of the work in accordance with the drawings and specifications. Bidders are expected to visit the site of work and after investigation to decide for themselves the character of the materials to be encountered. The Government does not guarantee the nature of the proportions of the various materials to be encountered and it shall be the bidders’ responsibility to determine the extent and character of the materials to be encountered.
This contract shall include all excavation, clearing and grading for structures and paving as shown on plans to effect the necessary lines and grades in conformity with plans and as required due to existing conditions. Unsuitable materials removed shall be disposed of by the contractor. Suitable materials removed in establishing a grade may be used as back fill. Boulders encountered, too large to be used or not required, shall be taken up and removed from the site.
*****
6. Plaintiff’s contract was one of several let during the period from 1949 to 1954 to different contractors for the development of a site at Oakland, Maryland, for the Maryland National Guard. Initially a motor vehicle storage building was built. It was followed by the construction of a road, and later by the construction of a boilerhouse addition to the motor vehicle storage building. Thereafter came plaintiff’s contract for the construction of garages, a park *679 ing area, and a fence enclosing the entire area. Finally, a so-called headhouse addition, consisting mainly of offices and locker rooms, was constructed as an attachment to the main Armory building. However, none of the buildings, nor the road, constructed by the other contractors, went to the depth of excavation equal to that required of the plaintiff in the performance of the contract herein involved.
The overall project site was approximately 620 by 320 feet. Plaintiff worked on a rectangle of approximately 180 by 140 feet in the northwestern portion of the sité. Along the western side of the rectangle, plaintiff was to build 4 garages in a space 30 by 180 feet, and the balance of the area was to be made into a parking lot.
7. As stated in finding 3, prior to the submission of plaintiff’s bid, one of its officers made a site investigation. Among other things, he made inquiries of local people. As a result of his investigation, he ascertained that the general area around Oakland is rocky country. Furthermore, there was visual evidence of rocky strata in the road cuts leading to the project site itself. Plaintiff made no subsurface investigations to determine the existence of rock in the specific area in which it would be working. Normally, when plaintiff bids on a contract which requires excavation of all materials at the contract price, regardless of type (sometimes referred to as an “unclassified” contract), plaintiff makes a careful subsurface investigation. However, as it interpreted section 3-1 (b) of the specifications of the instant contract, it would, under the lump sum contract price, only be required to perform normal excavation which in its opinion would not include rock. Plaintiff considered this section, therefore, as constituting, or being equivalent to, a so-called “rock clause,” i.e., one providing extra compensation for excavating rock, and that, if in fact it did encounter rock which would require removal by other than normal excavating methods, additional payment would be made therefor. Accordingly, even assuming the limited period between the issuance of the invitation for bids and the time for the submission of bids would permit a careful subsurface investigation, plaintiff felt that in this instance it was unnecessary. In light of the information it did obtain concerning the gen *680 eral rocky nature of tbe Oakland area, the visual evidence of rocky strata near the project site itself, and its interpretation of the specifications, the encountering of rock in its excavation operations was not unexpected by plaintiff. While plaintiff felt that it was possible that it would encounter rock, it nevertheless also felt there was no certainty that it would, since, without elaborate subsurface explorations, it is not possible to know exactly what kind of materials will be encountered in a specific location until the excavation operation is actually performed.
8. On April 3, 1952, plaintiff began stripping the topsoil at the project site in preparation for its excavation operations, which commenced on or about April 15, 1952. In early May 1952, it was excavating the footings for one of the garages on the north end of the site. Part of the excavation consisted of soft earth. Plowever, as the excavation proceeded deeper, a type of laminated, rotten or deteriorated rock of a shale type was encountered. The layers were thin, consisted of small portions of deteriorated rock, and were mixed with dirt. This mixture of deteriorated rock and dirt was removed by the same method as the soft earth overburden, i.e., by pick and shovel. However, the deeper the footings were dug, the more consolidated and the harder the rock became, until it consisted of a degree of consolidation and hardness which made it impossible to remove by pick and shovel, or by powered machines such as power shovels or backhoes (which is also a powered piece of equipment, like a power shovel, but which has a bucket attached to the boom and operates in reverse so that the bucket moves toward the equipment instead of away from it, as does a power shovel). This hard rock was also laminated, but the laminations were thicker and tightly consolidated. The rock laminations were in a 30°-40° angle position. They were found in various specific locations at the bottom of the footing, and not continuously throughout the entire bottom.. When this hard, consolidated rock was encountered, plaintiff had performed the great bulk of the excavation in the footing necessary to reach the required grade, and in some parts of the footing had reached the required grade without encountering such rock.
*681 To test the thickness of the laminations and the hardness of the rock to ascertain whether further operations with pick and shovel or powered equipment such as a power shovel or backhoe was possible, at one point plaintiff employed pneumatic equipment, consisting of a compressor and a pavement breaker. As a result of the test, it concluded that removal of the rock could be. accomplished only by blasting or by the use of pneumatic equipment which would chip off the rock by pieces, such as a pavement breaker. In making this test, plaintiff removed and disturbed approximately y2 cubic yard of the rock.
9. On May Y, 1952, while plaintiff was making its test of the rock material with the pneumatic equipment, defendant’s inspector made a routine visit to the project and was advised by plaintiff’s job superintendent and plaintiff’s vice president, who had come to the site to inspect the material, of the encountering of the hard rock, of the use of the pavement breaker at one point, and of their opinion that the material was removable only by blasting or pneumatic methods and that plaintiff was, therefore, entitled to extra payment. Defendant’s inspector thereupon examined the footing insofar as it had been excavated, and also examined some of the deteriorated and smaller pieces of the shale material which was lying on the sides of the trench and which had been theretofore successfully excavated by pick and shovel. The inspector honestly and in good faith, but mistakenly, concluded that the hard, consolidated, rock on the bottom of the footing, to which plaintiff’s representatives were referring, was of essentially the same degree of hardness as the deteriorated rock lying on the sides of the trench, some pieces of which the inspector was able to crush manually. He also felt (although he did not so state) that the material could be removed practically and effectively by a backhoe. Accordingly, he stated that in his opinion, the material in question should not be classified as of a type warranting extra payment under the terms of the specifications and that he would not recommend any extra payment for its removal. He stated that, in any event, its removal by pneumatic equipment would not, in his opinion, constitute abnormal job labor or equipment within the mean *682 ing of section 3-1 (b) of tbe specifications for the type of footing operation involved. He further stated that under no circumstances was plaintiff to remove the material by blasting, since this might serve to weaken the footing foundations. The inspector stated, however, that he would refer the matter for decision to his superior, who was the authorized representative of the contracting officer.
Thereupon, a meeting at the project site was arranged to be held on May 12, 1952, to consider the question. A primary purpose of the meeting was to determine whether, if the contracting officer’s representative concluded that the material was of a type falling within the classification of section 3-1 (b) of the specifications which would justify extra payment for removal, the elevations of the footings should be raised to the height of the top of the rock strata, with the concrete poured directly upon and bridging the rock, thereby making its removal unnecessary. Accordingly, no further removal of the material in question was made prior to May 12.
10. On May 12,1952, a conference was had at the site, pursuant to the above-mentioned arrangements, between plaintiff’s vice president, plaintiff’s job superintendent, defendant’s inspector, and the representative of the contracting officer. After the latter inspected the trench and the rotten rock lying along the sides thereof, he agreed with defendant’s inspector and concluded, honestly and in good faith, but mistakenly, that the rock in question could be practically and efficiently removed either by a pick or a backhoe. The footing was 21 inches wide and he felt that a 12- or 18-inch bucket on a backhoe could remove the material without difficulty. His conclusion was reinforced by the fact that the contractors who had performed the construction work prior to plaintiff’s contract, as described in finding 6, had encountered material similar to that which he saw lying along the sides of the trench, had removed it with power shovels or backhoes, and had not submitted any claims for extra payment for such removal.
He also felt that, even if the material could not be removed by a backhoe, and it was necessary to use pneumatic equipment in the form of a pavement breaker, such as plain *683 tiff Liad used in its test, such equipment should be considered as normal for a footing excavation operation. He believed that plaintiff had already removed a large amount of the material, as evidenced by the piles lying on the sides of the trench, that the footing was practically completed and the harmed grade almost reached, and that all that remained vas the final “trimming up” operation. Accordingly, he advised plaintiff’s vice president that, in his opinion, the material was not such material as would warrant extra payment within the meaning of the specifications, and that plaintiff should remove it and excavate down to the grade elevations as originally planned. He confirmed the inspector’s previous direction that under no circumstances was plaintiff to remove the material by blasting.
At this time, boulders were also visible at two places in the footing. The contracting officer’s representative considered these boulders as falling into a different category. If not blasted, they would have to be removed by pneumatic equipment, i.e., a rock drill, for which he felt extra payment would have been justified. At those places, he directed that plaintiff need not go to the planned elevations but that, instead, the elevations of the footings would be raised and plaintiff could bridge the boulders by pouring the concrete directly over them.
Although the contracting officer’s representative directed plaintiff to remove the material in question and to excavate to planned grade, he did not direct plaintiff how to remove it, except that, as stated, he did prohibit blasting. Plaintiff’s representatives agreed that it would not be advisable to blast in the footings.
11. After the meeting of May 12, 1952, plaintiff’s officers further considered the problem of how to remove the material in question from the footing. Since the material was too hard to remove effectively by pick, and it would have taken too long to so remove it in any event, this method was rejected. Plaintiff did not have a backhoe at the site, but could have easily transported one there. It did have power equipment at the site to which one could have been attached. However, it decided against attempting to remove the material by a backhoe because the material was so hard that it *684 would not be possible to so remove it in any practical manner, and, in addition, such an attempt would possibly seriously damage the expensive equipment involved. Furthermore, even if a backhoe could remove some of the material, it might possibly do so in a manner in which a large section would lift out, leaving the side or the bottom of the footing with holes and thus making it wider or deeper than called for by the plans. These voids would then have to be filled in with concrete at plaintiff’s expense. Plaintiff considered such a method to be impractical and inefficient. Since it was prohibited from blasting, plaintiff concluded that the only alternative was to employ pneumatic methods. All of these conclusions were reasonable and in accordance with sound and practical construction principles.
Thereupon, plaintiff removed the material by a pneumatically operated pavement breaker, and by May 22,1952, had removed substantially all of the material from the footing in question.
12. (a) On May 22,1952, plaintiff sent the following letter to the defendant:
We wish to take this opportunity to quote our unit prices for the furnishing of necessary labor and material to perform the excavation of materials beyond the scope of the contract, since we encountered the type that could not be removed by normal labor, and should have been blasted. However, due to the structural formation of the rock, that is, being in vertical layers, had we blasted, we would have disturbed the underlying formation and could have produced an unsatisfactory foundation.
Under Section III, paragraph 3-1, the contract requires that great care be exercised in not disturbing the foundations, and consequently, in discussing this matter with Mr. Katonka, it was agreed between us that we would avoid blasting, but instead excavate the footings by the use of pneumatic tools to the plan elevations.
In view of the manner in performing the work, and the fact that it was confined to trenches of the foundations, we quote our proposal for furnishing the necessary labor and material to perform the added work at the unit price of $20.00 per cubic yard.
Even if a Backhoe had been utilized for the footing excavation, the bucket would have been wider than the footings, thereby disturbing the ground under the floor *685 slabs, and also the teeth would have pulled the rock out in such a manner that the foundation material would have been loosened and not satisfactory for placing of concrete footings.
Your authorization on the basis of this letter would be most appreciated.
(b) On May 26,1952, the contracting officer’s representative replied as follows:
We have received your letter dated May 22, 1952 in which you have quoted a unit price of $20.00 per cubic yard for excavation of materials beyond the scope of the contract on the above mentioned project.
This office does not concur in your desire for an extra on this excavation as we feel that the work could be accomplished by normal job labor, equipment, power shovels and without resorting to blasting. As this is covered in. Section III — Paragraph 3-1 — Sub-paragraph b it is obvious you have only complied with the specifications.
We have, by phone and letter, instructed you not to proceed with any extra work without written authority from this office, and since the authority for the extra work is hereby denied we are returning your proposal keeping one copy for our files.
13. As the work progressed, plaintiff encountered further similar material while excavating for the garage floor slabs, for a utility trench running from the garages to the motor vehicle storage building, and for the locations for the fence gateposts. Plaintiff removed the material at all these additional locations also by the use of pneumatic equipment. Since defendant had rejected plaintiff’s claim for additional compensation for the removal by pneumatic equipment of the same material at the first location in the footing, plaintiff submitted no additional requests for extra payment before it removed the material every time it encountered it at these various locations.
In all, plaintiff removed 47.64 cubic yards of the material from the footings, 92.2 cubic yards from the floor area, 88.5 cubic yards from the utility trench, and 1.6 cubic yards from the gatepost locations, totaling 229.94 cubic yards. The 47.64 cubic yards in the footings were removed after May 12 and substantially completed by approximately May 22, when plaintiff wrote the letter set forth in finding 12(a). The *686 excavation for the floor slabs commenced on June 15. The excavation for the utility trench commenced July 18, and for the gateposts on August 26.
The removal of rock by a pneumatically operated compressor and a pavement breaker is a slow, tedious, and expensive process. Two men are required to operate and remove rock with a pavement breaker, not counting the labor required to remove the chipped pieces of rock from the footing. Two such efficient workers can remove only about 3 cubic yards of rock a day.
14. In September 1952, while excavating in the parking area, which was adjacent to the area where the garages were to be located and where plaintiff had encountered the hard material in the footings for the garages, plaintiff encountered the same hard material. On September 5,1952, plaintiff wrote the following letter to the defendant:
We are unable to complete the excavation and paving on the above contract until we have your authority to remove the rock which is above the plan elevation.
This rock cannot be removed unless we resort to blasting and pneumatic equipment, both of which are beyond the scope of the contract. The contract provides that we are only obligated to excavate the type of material that can be moved by normal job labor and equipment. Neither blasting or resorting to the pneumatic method for removal of rock or any part, thereof, is considered normal job labor or equipment in the construction industi'y.
We are offering to perform this added work on the basis of $20.00 per cubic yard additional, since we feel that this is the fair market cost for performing this operation for our company at Oakland, Maryland.
Inasmuch as this is preventing the completion of the work, we would appreciate favorable consideration since we feel that the contract does not intend to impose a hardship on the contractor, and certainly no allowance was made by us in our original bid to the Government to cover this contingency.
Subsequently, it was arranged that the contracting officer’s representative would be present at the site to investigate the situation referred to in plaintiff’s letter, and to determine whether the excavation elevations in the area should be revised.
*687 On. November 16, 1952, the representative visited the site and witnessed an attempt by a bulldozer to move the material, the representative considering that a bulldozer would ordinarily be used for such an operation. However, the bulldozer was able only to skim over the top and to perform no substantial excavation. The representative concluded that, considering the relatively large amount of the material, it would not be practicable or efficient for plaintiff to remove the material by methods other than blasting. He accordingly stated that he would authorize the making of certain revisions in the elevations designated in the plans and the removal by blasting of the hard material to the newly revised elevations. He further agreed that, for the removal of the material, plaintiff should be paid an additional $20 per cubic yard for the total of such material as would be removed to the revised grades.
At this time, plaintiff’s representatives again raised the question of payment for the 229.94 cubic yards of the same hard material which plaintiff had already removed by pneumatic methods, as set forth in finding 13. The contracting officer’s representative stated that he had doubts as to the proper interpretation of section 3-1 of the specifications insofar as it applied to additional compensation for removals of rock or similar material by pneumatic methods since only blasting was specifically mentioned, and suggested a meeting with the official of the Department of Public Improvements (hereinafter sometimes referred to as the “DPI”) of the State of Maryland who was responsible for the preparation of the plans and specifications in question in order to ascertain what that department’s policy was in instances where contractors removed material of such nature by pneumatic methods. He also stated that, at the same time, he wanted to discuss with such official the proposed modification of the parking area grades. As a result, a meeting with said DPI official was arranged for November 19,1952.
Under an 'arrangement between the National Guard Bureau of the Department of the Army and the Military Department of the State of Maryland, the latter furnished the plans and specifications and agreed to supervise all non-armory construction in Maryland, even though the project *688 was built entirely with federal funds. The instant project was of this type. On such construction work, the Military Department of the State of Maryland availed itself of the services of the DPI in the preparation of the plans and specifications since in Maryland the drawing of plans and specifications and the general supervision of all construction for the several departments within the State, including the Military Department, are the responsibility of the Department of Public Improvements. Although, pursuant to this arrangement with the National Guard Bureau, the State Military Department employed the DPI in fulfillment of its obligation to furnish the plans and specifications, it supervised the construction herein involved with its own personnel. The above-mentioned officials who were designated as the inspector and the contracting officer’s representative on this project were actually employees of the Military Department of the State of Maryland, the contracting officer’s representative being the Construction Engineer of the State Military Department. As a matter of internal procedure, a proposed change order providing for additional compensation by reason of a change in or variation from the plans and specifications drawn by the DPI, and calling for interpretation thereof, would be submitted to the DPI for approval after it had been approved by the State Military Department’s Construction Engineer, who, as stated, was in this case designated as the contracting officer’s representative. The proposed change order would then be submitted to the contracting officer, an official of the Department of the Army, for final approval and execution.
15. (a) On November 19,1952, a meeting was held at the DPI, attended by the DPI official referred to in finding 14, plaintiff’s president, the representative of the contracting officer, and defendant’s inspector, at which time both the proposed change in grades and the overall rock excavation problem were discussed. The DPI official stated that he would approve the change in the parking area grades and the payment of extra compensation to plaintiff at $20 per cubic yard for the material in the area that would be removed by blasting. He further stated that it was the policy of the DPI to consider material which had to be removed by pneumatic *689 methods as also falling witbin the category of rock which would justify extra compensation, and that if a change order were submitted to him providing for such payment for the material which plaintiff had so removed, he would approve it.
As a result of this meeting, plaintiff’s officials were, mistakenly, under the impression that a meeting of the minds had now been reached that payment at $20 per cubic yard would be made both for the rock which had already been removed by pneumatic methods and the rock which was to be removed by blasting, subject only to a determination of the exact amount of the material involved in each case and the issuance of appropriate change orders. The contracting officer’s representative disagreed with the DPI official’s interpretation of the specifications and adhered to his original conclusion with respect to the impropriety of allowing additional compensation for the removal of the material by pneumatic methods. He regarded the DPI official’s statements as amounting only to a recommendation or a statement that he would not disapprove the change order if the contracting officer’s representative decided to approve it. However, he did not make known at the meeting his disagreement with the DPI official’s interpretation of the specifications.
(b) On November 19, 1952, the same day of the meeting at the DPI, plaintiff, in furtherance of its understanding of the agreements reached at the meeting, wrote a letter setting forth the approximate quantity of the rock in the parking area and on November 26, 1952, wrote another letter giving the exact quantity as 340.4 cubic yards, which, at $20 per cubic yard, would result in additional compensation for this work in the amount of $6,808 and requesting an extension of time of 90 days to perform the work. Attached to the letter was a drawing showing the basis for the cubic yard calculations. On December 3, 1952, the contracting officer’s representative formally approved the issuance of a $6,808 change order for said “rock excavation” as well as the time extension. On January 14, 1953, plaintiff, again hi furtherance of its understanding of the agreements reached at the meeting of November 19, 1952, similarly for *690 warded a letter with respect to the rock removed by pneumatic methods, together with a supporting drawing and calculations showing 229.94 cubic yards involved. The letter stated:
We are submitting six copies of drawing dated 1-9-53 which shows the extent of the rock excavated out of the structure area. Also enclosed please find six photostatic copies of calculations showing the computation of the quantity of this material.
In as much as this excavation involves material that could not be excavated by normal job labor or equipment, we are to be reimbursed for the additional work at the unit price of $20.00 per cubic yard.
If you recall at the time we met in the office of the D.P.I. to discuss this excavation, it was agreed that any material which had to be removed by the use of pneumatic tools was not considered as earth excavation coming within the scope of the contract.
We trust that this drawing and calculations furnishes you with the information required.
However, on January 15, 1953, the contracting officer’s representative sent the following letter to plaintiff:
We are returning herewith your drawings and calculation, on the above mentioned project, received by this department.
We are at a loss to understand why you have submitted this information to us as we have never requested same.
We refer you to our letter dated May 26, 1952 in which this office denied your claim for any excavation, as the work performed by your organization is clearly and definitely covered in Section III — Paragraph 3-1— Subparagraph B. It is obvious that you have only complied with the specifications.
On February 5, 1953, the contracting officer issued a change order in accordance with the representative of the contracting officer’s approval of December 3, 1952. Plaintiff did remove said rock material by blasting and has been paid the amount of $6,808 pursuant to this change order. This work is, therefore, not in issue in this case. The only amount in issue is the 229.94 cubic yards of the material which plaintiff excavated from the garage footings, the garage floor area, the utility trench, and the gatepost holes, as set forth in find *691 ing 13, which material was identical with the 840.4 cubic yards of the material in the adjacent parking area for which defendant did authorize additional payment by said change order, and for which 229.94 cubic yards plaintiff also claims $20 per cubic yard, or a total of $4,598.80, the same amount per cubic yard approved by defendant for excavating the identical parking area material.
16. On July 31, 1953, plaintiff submitted an invoice to defendant in the amount of $4,598.80, for the excavation of the 229.94 cubic yards at $20 per cubic yard as shown on the drawing submitted by its letter of J anuary 14, 1953, set forth in finding 15(b), as well as another invoice covering a claim it was making for additional earth excavation because of erroneous drawings. On September 14, 1953, the contracting officer’s representative returned the invoices, referring to his letter of January 15, 1953 which denied the claim, also set forth in finding 15(b). On September 22, 1953, plaintiff appealed to the Secretary of the Army from the denials of September 14, 1953. After additional conferences between representatives of plaintiff and defendant, the contracting officer, on April 11,1955, issued formal findings of fact denying the claims. Thereupon, on April 29, 1955, plaintiff appealed to the Secretary of the Army from the denials of April 11, 1955. After a hearing before the Armed Services Board of Contract Appeals, the Board decided, on November 7, 1956, that plaintiff was entitled to payment of its additional earth excavation claim. However, it denied the claim herein involved. On the basis of the evidence before it, the Board held that the material could have been moved by normal job labor and equipment, such as power shovels; that the first written notice given of the alleged changed condition was plaintiff’s letter of May 22, 1952, but by that time the condition had already been disturbed; that the first oral notice was given on May 7, 1952, to the inspector, and that even this notice came only after plaintiff had already commenced removing the material, and that by the time the representative of the contracting officer first saw the condition on May 12,1952, the material had already been substantially excavated; that had the condition not then been disturbed, the elevations might have *692 been changed so as to make the removal of the material unnecessary, thereby possibly prejudicing the Government; and that there was no changed condition under article 4 of the contract because (1) the material was neither materially different from those shown on the drawings nor indicated in the specifications since, as found, it could have been removed by normal job labor and equipment, and (2) the condition was not, in view of plaintiff’s pre-bid site investigation and the experience of the other contractors in removing the same material, unknown or of an unusual nature differing materially from those ordinarily encountered in work of the character provided.
17. In the light of the record before the Board, as well as the additional evidence introduced in the trial proceedings in this court, the Board’s decision, in the following respects, and for the following reasons, is grossly erroneous 'and, based upon the credible evidence, without substantial support:
1. The finding that the material in question eould have been moved by normal job and equipment, such as power shovels. There is no evidence of any kind that the hard material in such confined areas as the footings and trenches could have been removed by a power shovel. There was testimony that it could have been removed by a backhoe. Since such equipment was powered by the same type of machinery as a power shovel, and could have been simply attached to such machinery, it seems clear that, in making the finding, the Board was equating a backhoe to a power shovel. The fact that defendant itself never contended that a power shovel could be used, but instead contended only that the material could have been removed by a backhoe, compels this conclusion. However, the overwhelming weight of the credible evidence is that a backhoe could not have effectively and efficiently removed the material, which was too hard to be so removed, and which would in all probability have damaged the expensive equipment involved. If the material were in fact efficiently removable by a backhoe, no logical reason is 'apparent why the contractor would not have adopted such a relatively inexpensive and speedy method, rather than the expensive and time-consuming alternative of using pneumatically operated pavement breakers. Ee- *693 moval of the material by backhoe, if it were possible, could easily have been accomplished by the equipment already at, or quickly transportable to, the site.
Furthermore, even if a backhoe could have grasped and successfully moved a mass of the material, there was no assurance that it would not at the same time have removed such a block of it as to leave voids beyond the neat lines of the sides or bottom of the footing, requiring the contractor to fill such voids, at its own expense, with concrete. This is not a practical or efficient construction procedure, and could not fairly or reasonably have been within the contemplation of the parties.
The Board gave weight to the fact “that other contractors in the immediate area (roads and other buildings for the project) did move the rock with bulldozers, power shovels, or backhoes.” But it is now undisputed that plaintiff’s excavation went considerably deeper than that of any of the other contractors. The undisputed evidence is, further, that the deeper the excavation went, the harder the material became. For this reason, the experience of the other contractors is of little significance, as is the fact that they submitted no claims for additional payment for the material they removed, and especially so in light of the absence from the record of any of the contracts and specifications under which they operated and, therefore, of the extent of their own excavation obligations.
It is not clear whether the Board’s finding was intended to constitute a finding that the removal of the materials in question by pneumatically operated pavement breakers amounted to a removal by normal labor and equipment. No such specific finding was made, but the general finding that the material could have been moved by normal job labor and equipment would appear necessarily to constitute an acceptance of defendant’s contention to this effect and to amount to such a finding. However, again the overwhelming weight of the credible evidence is to the contrary. When specifications such as those herein involved refer to excavation by normal methods, and specifically mention power shovels in connection therewith, it appears plain that such excavation by shovels (or by the comparable method of *694 buckets on backhoes), refers to materials that can with reasonable ease be scooped up by such shovels and buckets. Hard, consolidated, rock-like material cannot be. When the slow and relatively expensive method of pavement breakers is employed, a method normally employed to remove concrete, it is not a normal method for such an excavation operation, and the construction industry so recognizes.
The conclusion that the removal of this hard material was not contemplated by the specifications to be covered by the contract price is strongly reinforced by two factors: (a) defendant agreed to pay plaintiff $20 per cubic yard additional for the removal of the identical material in the adjacent parking area; (b) the officials responsible for the drafting of the specifications interpreted them so as not to include the removal of material by pneumatic methods in the lump sum contract price.
As to the first, the Board did note that there was “a subsequent modification of the contract increasing the price when the same rock (which was blasted) was encountered by appellant in the parking area.” However, for reasons not disclosed, the Board seemingly gave this circumstance little or no weight. Possibly it was the fact that the material in the parking area was blasted rather than removed by pneumatic methods that caused the Board to ignore a factor that ordinarily would be considered to have almost conclusive weight since the material was, as the Board noted, identical. However, the evidence is uncontested that defendant prevented plaintiff from blasting in the particular areas herein involved and that removal by pneumatic methods was, therefore, the only other alternative. Defendant contends that the use of backhoes would have been impractical in the larger parking area, and therefore would not have amounted to normal labor and equipment considering the type of excavation operation therein involved. It further contends that in the smaller trench and footings areas, the removal of the relatively small amount of the material found at the bottoms thereof would constitute normal equipment and labor for such an operation, since it only amounts to trimming the footings to neat lines prior to the receipt of the concrete. However, this is a distinction *695 that finds no rational support in the record. It was just as difficult to remove the small, separate, portions of the material where they occurred in the various parts of the area herein involved as it was in the parking area, where the material was found in more continuous formation.
While it would, of course, be possible to trim up a footing with a pavement breaker, even though it is only loose material that is involved, it is clear that that would not be the normal equipment for such an operation. In such an instance, pick and shovel, or a backhoe, would normally be used. Furthermore, when all the smaller amounts of the material removed in the various places herein involved are totaled, the aggregate amount is not so disproportionately small as to warrant the distinction relied on of a large mass of the material as against a number of small areas. The total excavation of the material in the parking area for which defendant did allow additional compensation in the amount of $6,808 was 340.4 cubic yards, whereas the amount herein involved is 229.94 cubic yards, which at the same $20 per cubic yard price, totals $4,598.80.
2. The finding that the condition had teen substantially disturbed by May 7, 1952, when the first oral notice was given to defendant's inspector. This finding could only have been made on the assumption that the overburden material excavated up to the time the hard material was encountered at the bottom of the footing was substantially the same as the hard material, the total excavation for the footings in fact being substantially completed by reason of the successful excavation of the soft overburden. The amount included in the instant claim with respect to the footings comprises only approximately 10 percent of the total excavation for the footings. Obviously, therefore, a finding that the entire footing excavation was substantially complete by May 7, 1952, is nevertheless consistent with the fact that the hard material had not as yet been disturbed. As set forth in finding 9, defendant’s inspector on May 7, 1952, did mistakenly assume that all the materials were the same, judging the hard material on the bottom by the material successfully excavated theretofore by pick and shovel and which was lying on the sides of the *696 trencb. Since this basic assumption was erroneous, the Board’s finding has no substantial support. On or about May 7, the hard material was first encountered, and it was on that day that defendant’s inspector saw it and saw plaintiff first testing it with pneumatic equipment. Only approximately cubic yard was disturbed as a result of this test (finding 8).
S. The finding that the condition had been further disturbed by May 12,1952, when the contracting officer's representative first saw it. Since the entire purpose of the meeting with the contracting officer’s representative on May 12, 1952, arranged for on May 7 or shortly thereafter, was to give the representative an opportunity to see the condition and to determine whether to raise the footing elevations in the places where the hard material was encountered, a finding that plaintiff made substantial removals of the material between May 7 and May 12 would attribute to plaintiff a course of conduct designed to frustrate the entire purpose of the meeting. The record is bare of any evidence tending to support such a conclusion, nor was any reason advanced why plaintiff would have acted so irrationally. The record is clear that after the inspector saw the condition on May 7, and stated that he wanted the contracting officer’s representative to see it to determine whether the elevations should be raised, all further attempts to remove the material ceased until the representative could see it, which he did on May 12. The condition was the same on May 12 as it had been on May 7.
A The finding that the condition had been substantially disturbed by May 22,1952, %ohen the first written notice was given. This finding is correct only insofar as the 47.64 cubic yards of material in the footings are concerned (findings 11 and 13). The excavation of the balance of the material in the other areas involved in the claim had not even commenced in May (finding 13). As noted, however, the contracting officer’s representative had seen the condition in the footings on May 12, 1952 before it had been disturbed to any substantial degree. Since at that time he ruled that the material could be removed by normal methods, that no changes in the planned elevations were to be made, and that *697 no extra compensation was allowable for the removal thereof, no further written notices were given to defendant when the same material was encountered and removed in the floor slab area in June 1952, in the utility trench area in July 1952, and at the gatepost locations in August 1952 (finding 13), plaintiff considering it unnecessary to ask for a new ruling every time identical material was encountered in the area as the work progressed.
The balance of the Board’s findings are of an ultimate character and in the nature of conclusions of law.
18. Twenty dollars per cubic yard was a reasonable price for the removal of the material in question. If plaintiff is entitled to recover for the removal of the 229.94 cubic yards herein involved, the amount due and owing to it is $4,598.80.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of four thousand five hundred ninety-eight dollars and eighty cents ($4,598.80).